# WIGGINS v. STATE

[No. 326, September Term, 1963.]

98

*Decided May 28, 1964.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and MARBURY, JJ.

*George L. Russell, Jr.,* with whom was *Richard K. Jacobsen* on the brief, for the appellant.

*Roger D. Redden, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell, State's Attorney for Baltimore City,* and *George J. Helinski, Assistant State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appellant Wiggins was convicted by two judges sitting without a jury in the Criminal Court of Baltimore of robbery with a deadly weapon and of murder in the first degree committed during a holdup of a liquor store.

In support of his effort to secure a reversal in this Court, appellant argues that the evidence was insufficient to support the trial court's denial of his motion for a judgment of acquittal at the end of the State's case and insufficient to permit the ultimate finding by the triers of fact of guilt beyond a reasonable doubt.

Wiggins, after having been told by his conscientious, capable and experienced lawyer of his rights and privileges in the matter, said to the judges in open court that he had been advised of and knew his rights and would not himself testify either on the issue of the admissibility of his confession—which he claimed below and claims here was involuntary—or on the issue of his guilt. He further told the court, at the conclusion of the State's case, that he had freely and voluntarily decided not to call any witnesses in his behalf. It is apparent, therefore, that Wiggins' two contentions are two aspects of the same claim of the insufficiency of the State's evidence.[1]

---

1. Wiggins wrote two letters to the Court, after his lawyer had filed his brief, in which he expresses dissatisfaction with the presentation of his case to this Court and presents a number of contentions, many of which are vague and irrelevant, such as, complaints as to the manner of his temporary commitment to a State mental hospital before trial and as to being examined at the hospital. Others are that he was illegally arrested (he was arrested after he admitted to the police that he had pointed a gun at his "girlfriend," and only after he was in custody was he implicated in crimes for which he was convicted), that he had no preliminary hearing before his indictment by the grand jury (none is required), that he was tried "in a closed courtroom" (apparently he refers to the fact that the witnesses were sequestered), and that the State had previously tried another—one James—for the same crimes and it was illegal for the State to try him before the same judges, using the same prosecutors and witnesses. (James had been acquitted and in open court, at the beginning of his trial, Wiggins' lawyer told him the same judges who were to try him had tried James and asked if he had any objection to them. Wiggins, after revealing that he was twenty-nine years old and had gone through high school, said he wished a court trial and that it would be his preference to have the same judges who tried James try him, and that his right to seek other judges had been explained to him). Wiggins also claimed in his letters that his confession was inadmissible which, of course, is the principal contention made by his lawyer in his able arguments to us, both printed and forensic.

The corpus delicti was proved by a woman clerk in the store at the time of the holdup who saw the shooting of the proprietor and by the autopsy physician. The involvement of Wiggins was established to the satisfaction beyond a reasonable doubt of the two judges who heard the case by the testimony of one Shirley Dockins, Wiggins' "girl-friend," who had come into the case when she complained to the police that Wiggins had threatened her with a pistol. She testified that about an hour and a half after the holdup of the liquor store Wiggins told her he thought he had killed a man, and soon after took her in a car to the store and pointed it out as "the store where the accident happened." The next morning Wiggins told Miss Dockins to go out and buy two newspapers and then read aloud to her the newspaper accounts of the murder—and nothing else—and told her the newspapers were wrong in suggesting that two men had been involved. Wiggins told Miss Dockins in detail of going into the store, of demanding and getting money from a young male clerk, that as he went to the rear of the store to look for more money, a man then came down some steps and poked something (later identified as a shotgun) in his back, that he turned around and the man shot the young clerk, that he hit the man hard on the head with his pistol and, fearing recognition, finally shot the man and left.

Late Saturday morning, June 23, 1962, Wiggins was questioned at 2020 Ellsworth Avenue with reference to a pistol and, after admitting pointing it at Shirley Dockins, he was booked at the Western District Police Station for investigation of assault with a pistol upon Miss Dockins. Between 9:55 p.m., June 25, 1962, and 12:10 a.m., June 26, 1962, Wiggins was interrogated by police officers at Western as to the robbery and murder. He voluntarily drew a layout of the store as he recalled it, and gave the officers a statement relative to his participation in that event, which was typed and signed. In this statement, Wiggins confessed, in detailed length substantially identical to his previous intimate revelation to Shirley Dockins, to armed robbery of the store and to the murder, the crimes for which he was convicted.

Appellant says that the Dockins testimony was vague and

unreliable and, because she and Wiggins had a fight in June during which he hit her and threatened her with an iron, she had an animosity towards him which led her to fabricate her story.

The Dockins testimony was not so contradictory or inconclusive inherently as to render it without probative force if believed, and there was corroboration of some of it. The bias, reliability and credibility of the witness and the weight to be given her testimony was for the triers of fact to pass on.

Wiggins says his confession and statement to the police were inadmissible because he did not realize the consequences of saying what he said and did not make them voluntarily and of his own free will. He does not claim physical, mental or psychological coercion, or promise or inducement, but rather that he was an habitual heavy drinker who, after several days in police custody without alcohol, suffered from delirium tremens during which he had hallucinations. He relies on the fact that on June 27 the police had him committed to Crownville State Hospital, where the diagnosis was an acute (temporary) brain syndrome induced by excessive indulgence in alcohol, and that the admission notes spoke of Wiggins having been drinking heavily for years and of seeing and hearing things. He argues also that on June 26, the day after he confessed, he told the police he had rabbits in his hands and had pulled "angel's hair" from his body.

The witnesses in the trial were sequestered. A succession of police officers testified as to the completely voluntary nature of the confession and the statement. The record conveys the impression of their truth and candor. The officers said that from June 23 through June 25 Wiggins' speech was plain, he appeared rational and coherent, although his eyes were bloodshot and, to at least one officer, he gave the impression that he was coming out of a "hang-over." During his interrogation on June 25, he perspired freely and at times seemed somewhat nervous.

There was medical testimony that memory need not be impaired by the sufferings of the withdrawal from alcohol and that the symptoms of this condition lend themselves to the fakery of malingering. One experienced police officer accused

Wiggins of this at times on June 26, the day he gave the statement exonerating James, and said that when he did Wiggins would "snap out of it." Other medical testimony was that the symptoms and conditions of an individual who has withdrawn from excessive use of alcohol may vary from day to day and that Wiggins could have been hallucinated as to rabbits or other things one day and not be so the day before or hours before.

We think the trial judges properly could have found Wiggins' confession and statement to have been voluntary and credible. The crucial question was not whether he was suffering from the effects of withdrawal from excessive alcoholic indulgences when he gave them, but whether his disclosures to the police were freely and voluntarily made at a time when he knew and understood what he was saying, *Bryant v. State,* 229 Md. 531; *2 Underhill's Criminal Evidence,* Sec. 393 (5th Ed.); *2 Wharton's Criminal Evidence,* Sec. 388 (12th Ed.), and there was persuasive evidence before the trial judges that Wiggins' confession and statement met these tests.

Wiggins urges further that the trial judges, in admitting his confession and statement did not discriminate between voluntariness and credibility and that even if a confession is credible and corroborated—as the judges with much documentation found that Wiggins' was—it is not admissible if not voluntarily given. The record refutes the contention. The judges, after testimony on voluntariness had been completed, heard argument on admissibility and, then, without comment, admitted the disclosures to the police into evidence. The court then heard argument on the question of innocence or guilt, and Judge Sodaro said:

> "Needless to say, Judge Harlan and I have been conferring at some length throughout the trial. And, after argument from both sides in this case, we found specifically that the confession of the defendant Wiggins was voluntary. And we now find that it is still voluntary after hearing argument from Mr. Russell. And we find that it is vountary and trustworthy and reliable. We feel that this confession has been amply corroborated in several aspects."

Then, after reciting various matters which the judges felt corroborated and gave credence to the confession, it was said:

"We feel that under all of the facts and circumstances of this case that this confession was freely and voluntarily given by the defendant to the police. And, in fact, unsolicited by the police.

"We find it to be trustworthy and reliable in that it has been corroborated amply by the elements which I have referred to."

The further point is made by Wiggins that since on cross-examination of a policeman he had introduced a confession by one James and a confession by one Stewart indicating that they had perpetrated the crimes for which he was being tried, the trial judges properly could not find that a prima facie case had been made out against him.

There is no merit to the point. James had already been acquitted by the two judges who were trying Wiggins because, as they stated in the Wiggins trial, they did not believe James' confession, and the guilt of Stewart, alleged to have been a perpetrator with James, stood or fell apparently with that of James. Moreover, Wiggins had himself exonerated James in his own statement to the police. The fact of the other confessions bore on the question the trial judges had to decide—Wiggins' innocence or guilt—and the weight of the other confessions and their bearing on that question was for them to decide, but the fact that other confessions were in evidence did not keep the State's evidence from amounting to a prima facie—or indeed a convincing—case against Wiggins. *Thomas v. State,* 186 Md. 446; *Brady v. State,* 226 Md. 422; 23 Md. L. Rev. 178.

*Judgments affirmed.*