*Elijah Peterson v. State of Maryland*, No. 14, September Term 2019. Opinion by Hotten, J.

**CRIMINAL LAW – POST-CONVICTION RELIEF – UNIFORM POST-CONVICTION PROCEDURE ACT** – The Uniform Post-Conviction Procedure Act ("UPPA"), codified at MD. CODE ANN., CRIMINAL PROCEDURE § 7-101 ("Crim. Proc."), states that the UPPA applies to a person "confined under sentence of imprisonment; or [ ] on parole or probation." The Court of Appeals held that Mr. Peterson, who was found guilty but not criminally responsible, was not eligible for post-conviction relief under the UPPA, based on the plain language of the Act. Although the Act is remedial in nature and construed liberally, the plain language of the Act only applies to an individual convicted in Maryland who is imprisoned or on parole or probation.

**CRIMINAL LAW – POST-CONVICTION RELIEF – WRIT OF ERROR *CORAM NOBIS*** – "The essential nature of the writ of *coram nobis* is that it is an 'extraordinary remedy' justified only under circumstances compelling such action to achieve justice." *Hyman v. State*, 463 Md. 656, 671, 208 A.3d 807, 815-16 (2019) (emphasis omitted). The Court of Appeals held that *coram nobis* relief is available only to those who sufficiently plead the following five elements: (1) the grounds challenging a conviction are based on constitutional, jurisdictional, or fundamental grounds, (2) the burden to rebut the "presumption of regularity" is overcome, (3) the petitioner has suffered or is facing significant lingering collateral consequences from the conviction, (4) no other common law or statutory remedy is available, and (5) the issue is not being relitigated in the *coram nobis* proceeding. Mr. Peterson was unable to show that he suffered significant collateral consequences that would afford him relief through a writ of error *coram nobis*.

**PETITION FOR WRIT OF *HABEAS CORPUS* – NOT CRIMINALLY RESPONSIBLE –** Maryland's *habeas corpus* statute, codified at MD. CODE ANN., COURTS & JUDICIAL PROCEEDINGS § 3-702(a) ("Cts. & Jud. Proc."), states that any "person committed, detained, confined, or restrained from his lawful liberty within the State for any alleged offense or under any color or pretense or any person in his behalf, may petition for the writ of *habeas corpus*[.]" Defendants found guilty but not criminally responsible may be eligible for *habeas corpus* relief.

IN THE COURT OF APPEALS

OF MARYLAND

No. 14

September Term, 2019

_____

ELIJAH PETERSON

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Greene, Clayton, Jr. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed: March 31, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Section 3-110 of the Criminal Procedure Article ("Crim. Proc.") provides defendants the opportunity to plead "not criminally responsible" to a criminal charge. The General Assembly enacted §§ 3-101–123 to outline the process for such a plea. When a defendant is found guilty but "not criminally responsible" ("NCR"), the defendant is committed to the Maryland Department of Health ("the Department") for inpatient care or treatment.[1] A court may thereafter authorize "conditional release" for a defendant with specified conditions recommended by the Department, and if the defendant violates those conditions, the defendant may be re-confined to an appropriate facility chosen by the Department. The instant case addresses whether defendants found guilty, but not criminally responsible, may seek post-conviction relief through the Uniform Post-Conviction Procedure Act, a writ of error *coram nobis*, or a writ of *habeas corpus*.

Petitioner, Elijah Peterson ("Mr. Peterson"), seeks review of a ruling by the Circuit Court for Prince George's County that denied both Mr. Peterson's request for post-conviction relief under the Uniform Post-Conviction Procedure Act ("UPPA") and his Petition for Writ of Error *Coram Nobis*. The Court of Special Appeals affirmed. We granted *certiorari* to answer the following three questions:

1. Is post[-]conviction relief available to a person who has been convicted of a crime, found not to be criminally responsible, and is either committed to a psychiatric hospital or on conditional release?

2. Is *coram nobis* relief available to a person who has been convicted of a crime, found to be not criminally responsible, and is either committed to a psychiatric hospital or on conditional release?

---

[1] At the time of Mr. Peterson's commitment in 2007, the Department was known as the Department of Mental Health and Hygiene. It was renamed the Department of Health in July 2017. Chapter 214, Laws of Maryland 2017.

3. Did the [Court of Special Appeals] err in holding that [Mr. Peterson], who was convicted of a crime and found not to be criminally responsible and was on conditional release, was not eligible to collaterally challenge his convictions by either a post[-]conviction petition or a petition for writ of *coram nobis*?

For reasons discussed below, we affirm the well-reasoned analysis of the Court of Special Appeals on the questions presented. However, given the Court's recent decision in *Sabisch v. Moyer*, a circuit court, upon receipt of an appropriate filing, could render a determination regarding whether Maryland's *habeas corpus* statute is implicated with respect to Mr. Peterson.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

In March 2007, Mr. Peterson, while walking down the middle of the road on Marlboro Pike in Prince George's County, pointed what appeared to be, a rifle at a police vehicle as it passed. He was subsequently arrested and charged with one count of auto theft, one count of attempted theft over $500, one count of unauthorized use of a motor vehicle, one count of attempted armed carjacking, two counts of first-degree assault, and two counts of second-degree assault. Mr. Peterson entered a plea of not guilty, but through counsel, proceeded to a bench trial on an agreed statement of facts. The bench trial consisted of the following colloquy:

> [THE STATE]: Your Honor, had this matter gone to trial, the State would have put on evidence that on March 6, 2007, members of the Washington Area Vehicle Enforcement Team were working in the area of Marlboro Pike and Brooks Drive. Corporal Stakes and Corporal Aponte of the Prince George's County Police Department were driving west on Marlboro Pike when they observed the Defendant, Mr. [ ] Peterson, . . . entering the roadway

2

with what they believed to be a silver rifle, held with both hands, raised at shoulder level with his head tucked downward, pointing the perceived weapon at an oncoming vehicle. The county cruiser was in the slow lane and the first vehicle was in the fast lane. The driver of the first vehicle slammed on its brakes and swerved in front of their vehicle to avoid [Mr. Peterson], who appeared to be pointing a silver rifle at that particular car.

Mr. Peterson was still in the roadway, still advancing forward, pointing the apparent rifle at Corporal Aponte, who was driving a 1987 brown Chevrolet truck. Corpora[l] Aponte recognized the silver weapon and . . . [he] stopped his vehicle because he believed that [Mr. Peterson] was attempting to carjack both the Corporal and the other motorist. At that time Corporal Aponte got out of his vehicle and confronted [Mr. Peterson]. He gave Mr. Peterson verbal commands to drop the weapon and get on the ground and placed him under arrest without incident.

Further investigation revealed that what they believed to be a silver rifle[] was, in fact, a silver caulk gun[] and all events occurred in Prince George's County, Maryland.

THE COURT: Was the caulk gun loaded?

[MR. PETERSON]: No.

THE COURT: It wasn't loaded. Okay.

[DEFENSE COUNSEL]: Your Honor, those are the allegations. We believe it's a true statement of facts as to what occurred on that particular date.

THE COURT: Okay. Well, that being the case, the Court finds him guilty of the offenses.

* * *

[DEFENSE COUNSEL]: What is supported [by the facts] would be second degree assault of both police officers.

THE COURT: I find him guilty of that.

[DEFENSE COUNSEL]: But the other charges, the auto theft, there was no auto theft.

THE COURT: How about – okay.

3

[DEFENSE COUNSEL]: Right. They stopped.

THE COURT: All right. I find him not guilty of the other counts, then. And I also find him not criminally responsible based upon the report from Springfield.

Overall, the circuit court found Mr. Peterson guilty of two counts of second-degree assault, and determined that he was NCR because he lacked substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the requirements of the law. *See* Crim. Proc. § 3-109(a).[2]  Thereafter, the circuit court ordered Mr. Peterson to be civilly committed to the Department for inpatient treatment.  The court never asked Mr. Peterson whether he was pleading guilty or not guilty.  The court never advised Mr. Peterson that he had a right to a jury trial or asked whether he was waiving that right.

On December 5, 2007, the circuit court ordered Mr. Peterson to be conditionally released from the Department for a period of five years, subject to conditions that included mandatory mental health and substance abuse treatment.  Mr. Peterson was also required to comply with recommendations from his mental health treatment provider and either reside on hospital grounds or in other housing approved by the Department. [3]  He was

---

[2] Crim. Proc. § 3-109(a) states: "A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:
    (1) appreciate the criminality of that conduct; or
    (2) conform that conduct to the requirements of law."

[3] Mr. Peterson was ordered to comply with the following types of recommendations given by his mental health provider:
  A. Type and frequency of treatment interventions;

(continued . . .)

4

required to voluntarily admit himself to a psychiatric facility as requested by his mental health provider. Mr. Peterson could not own, possess, or use a firearm of any kind or take illicit drugs, use alcohol, or abuse prescription drugs. Between 2008 and 2013, the circuit court issued Mr. Peterson multiple orders for conditional release, in which the circuit court placed similar conditions on Mr. Peterson as the original order in December 2007. In March 2013, the circuit court maintained the previously imposed conditions, but also required Mr. Peterson to refrain from initiating contact with the victim of his crime.

*Procedural Background*

### 1. Circuit Court Proceedings

On July 24, 2012, during conditional release, Mr. Peterson filed a *pro se* petition for post-conviction relief under the Uniform Post-Conviction Procedure Act ("UPPA").[4] After securing counsel, Mr. Peterson filed a Supplemental Petition for Post-Conviction Relief, which asserted (1) Mr. Peterson's NCR plea was the functional equivalent of a guilty plea

---

(. . . continued)

    B. Participation in other programs such as a day program, family therapy, marriage counseling, alcohol and substance abuse treatment, vocational rehabilitation, and job counseling;
    C. Taking prescribed psychiatric medication and submitting to such laboratory tests, as the prescriber of the psychiatric medication shall deem necessary to monitor the blood levels and the effectiveness of the medication;
    D. Applying for inpatient psychiatric treatment.
    E. Employment.
    F. Travel outside of the State of Maryland. (parenthetical omitted).

    [4] Crim. Proc. § 7-103 states: "(a) For each trial or sentence, a person may file only one petition for relief under this title. (b) Unless extraordinary cause is shown, a petition under this subtitle may not be filed more than 10 years after the sentence was imposed."

and was invalid because the record failed to demonstrate that he understood the nature of the charges and (2) Mr. Peterson's original counsel was ineffective because he did not inform Mr. Peterson of the consequences of pleading NCR.

On June 11, 2013, the circuit court conducted a hearing regarding Mr. Peterson's post-conviction request. On November 15, 2013, the court denied Mr. Peterson's request for post-conviction relief and held that Mr. Peterson was neither "confined" nor on "probation or parole," for purposes of the UPPA.

On January 10, 2014, while committed, Mr. Peterson filed a Petition for Writ of Error *Coram Nobis* and requested a hearing to vacate the 2007 NCR judgment. After a hearing, the circuit court found that Mr. Peterson's commitment to the Department was a direct consequence of his NCR plea, and, therefore, not a collateral consequence. The court denied Mr. Peterson's request for *coram nobis* relief. Mr. Peterson's subsequent motion for reconsideration was also denied because the court determined that Mr. Peterson was never "convicted" and that he failed to demonstrate significant collateral consequences.

Mr. Peterson timely appealed both the denial of his respective petitions for post-conviction claim and his *coram nobis* relief to the Court of Special Appeals.

2. The Court of Special Appeals Proceedings

The Court of Special Appeals initially reviewed the history of the NCR plea to ascertain whether a defendant who enters such a plea, is eligible for post-conviction or *coram nobis* relief. *Peterson v. State*, 2019 WL 328416 at *3-5 (2019). The Court of Special Appeals held that the

6

NCR statutory scheme recognizes that 'no valid purpose would be furthered by holding the [NCR defendant] accountable for his acts. [NCR] is a recognition that none of the theories which underlie our criminal law— prevention, restraint, rehabilitation, deterrence, education, and retribution— are furthered by punishing' those found to be NCR.

*Id.* at *5 (quoting *State v. Garnett*, 172 Md. App. 558, 564, 916 A.2d 393, 396 (2007)). Accordingly, the Court of Special Appeals determined that a defendant convicted of a crime and subsequently found NCR was not subject to criminal punishment. *Id.* The Court held that commitment for those found NCR and the restrictions associated with conditional release were intended to protect the public and the patient, not to punish. *Id.* (quoting *Harrison-Solomon v. State*, 442 Md. 254, 286-87, 112 A.3d 408, 428 (2015)).

In addressing the UPPA, the Court of Special Appeals held that "[Mr. Peterson] satisfie[d] the [UPPA] requirement of being 'a person convicted in any court in the State,' because he was found guilty of two counts of second degree assault." *Id.* at *6. The Court then analyzed the following UPPA requirements: "(1) confined under sentence of imprisonment; or (2) on parole or probation." Crim. Proc. § 7-101. Although the Court held that Mr. Peterson satisfied the conviction component, it also held that conditional release was not the equivalent of being on parole or probation as required by the UPPA for two reasons: (1) parole and probation are unambiguous and defined by Black's Law Dictionary and (2) the General Assembly did not intend to include conditional release when it expressly codified parole and probation. *Id.* at *6-7. The Court determined that parole and probation are criminal sanctions, whereas conditional release from civil commitment is not. *Id.* at *6. Therefore, "[a]n NCR defendant on conditional release does not satisfy the requirement of the UPPA that the defendant be 'on parole or probation.' To interpret

7

the UPPA otherwise . . . would expand the UPPA beyond its clear scope." *Id.* at \*7. The Court also addressed confinement under the UPPA, indicating that confinement refers to defendants subject to criminal sanctions, not civil confinement. *Id.*

Regarding the *coram nobis* issue, the Court outlined the factors relied on in *Jones v. State*, 445 Md. 324, 126 A.2d 1162 (2015) and *Anderson v. Dep't of Health and Mental Hygiene*, 310 Md. 217, 528 A.2d 904 (1987), to adjudicate the instant case. Relying on these cases, the Court of Special Appeals held Mr. Peterson's "commitment and conditional release are a direct consequence of his conviction and subsequent NCR finding[,]" not merely a consequence of the NCR finding alone. *Id.* at \*8. Since Mr. Peterson's commitment was not a collateral consequence of the conviction, the Court of Special Appeals concluded that he was not entitled to *coram nobis* relief. *Id.*

Mr. Peterson timely appealed to this Court, and we granted *certiorari*.

**STANDARD OF REVIEW**

We review interpretations and applications of Maryland constitutional, statutory, or case law, under a *de novo* standard of review to establish "whether the trial court's conclusions are 'legally correct.'" *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175, 184 (2006). This Court "will not disturb the factual findings of the post-conviction court unless they are clearly erroneous." *Arrington v. State*, 411 Md. 524, 551, 983 A.2d 1071, 1086 (2009). When reviewing a lower court's grant or denial of a *coram nobis* petition, we apply an "abuse of discretion" standard of review. *State v. Rich*, 454 Md. 448, 471, 164 A.3d 355, 368-69 (2017).

8

## DISCUSSION

### A. *In a criminal case, the court may declare the defendant NCR after a guilty finding, generating different consequences from those only found guilty.*

A defendant is NCR "if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to: (1) appreciate the criminality of that conduct; or (2) conform that conduct to the requirements of law." Crim. Proc. § 3-109(a). The defendant has the burden of proof on this issue by a preponderance of the evidence. Crim. Proc. § 3-110(b).[5]

After the court finds the defendant NCR, "the court shall order the defendant committed to the facility that the Health Department designates for institutional inpatient care or treatment." Crim. Proc. § 3-112(b). The defendant may be discharged "from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged." Crim. Proc. § 3-114(b). The defendant may be "eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court." Crim. Proc. § 3-114(c). Before the court can release the defendant from civil confinement, with or without conditions, the court must determine whether the defendant is dangerous. For conditional release, the court considers the defendant's dangerousness within the context of the proposed conditions. *Hawkes v. State*, 433 Md.

---

[5] Crim. Proc. § 3-110(b) states: "The defendant has the burden to establish, by a preponderance of the evidence, the defense of not criminally responsible."

9

105, 133, 70 A.3d 308, 325 (2013). If the defendant violates the terms of conditional release, the defendant may be re-confined to a designated facility. *See* Crim. Proc. § 3-121(i)(1). Finally, a defendant who has been civilly confined may apply for release, and the trier of fact shall decide whether the defendant must remain in confinement, may be conditionally released, or may be discharged from commitment. Crim. Proc. § 3-119.

In the case at bar, Mr. Peterson was civilly confined and conditionally released several times.

**B. The UPPA's plain language does not support expanding post-conviction relief to those found NCR.**

The jurisdiction of the UPPA extends to "a person convicted in any court in the State who is: (1) confined under sentence of imprisonment; or (2) on parole or probation." Crim. Proc. § 7-101. Mr. Peterson was on conditional release when he filed his petition for post-conviction relief. This Court must decide whether the UPPA is available to one civilly confined or on conditional release.

1. Principles of statutory interpretation.

Our primary goals in the interpretation of a statute are to ascertain the General Assembly's desired purpose and goals and remedy the issue addressed in the legislation. *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007).

> As [we have] explained, to determine [the General Assembly's] purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute

10

as it is written.  In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning.  If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives, and the purpose of the enactment under consideration.  We have said that there is an ambiguity within a statute when there exist[s] two or more reasonable alternative interpretations of the statute.  When a statute can be interpreted in more than one way, [our job] is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

*Bellard v. State*, 452 Md. 467, 481, 157 A.3d 272, 280 (2017).  Moreover, we will avoid an absurd interpretation and interpret the plain language within the context in which it appears.  *Id.* at 482, 157 A.3d at 280.

In the case at bar, we must define the following words as they are used in the UPPA: "convicted," "parole," and "probation."  Mr. Peterson argues that "convicted," "parole," and "probation" are ambiguous and that the Court of Special Appeals should have considered the statutory scheme and legislative history to comport with the General Assembly's intent.  Mr. Peterson contends that we should avoid construing the UPPA to exclude defendants found NCR to avoid constitutional issues, because no other collateral remedy exists.  The State counters, indicating that the plain language of the UPPA limits its application to incarcerated defendants or those on parole or probation and that the plain language conveys the intent of the General Assembly.  The State argues that civil commitment and conditional release are not equivalent to incarceration or parole and

11

probation. The State asserts that no constitutional issues arise, even if we exclude defendants found NCR from relief under the UPPA.

Upon review, we determine that "convicted," "parole," and "probation" are unambiguous and apply the plain meaning of the words.[6] We explain.

### 2. Under the plain language of the UPPA, the General Assembly excluded conditional release from its application.

The Court of Special Appeals applied a plain meaning analysis to "parole" and "probation." We agree with, apply, and restate the reasoning of the Court of Special Appeals.

"Parole" is "a conditional release from confinement granted by the [Maryland Parole] Commission to an inmate." MD. CODE ANN., CORRECTIONAL SERVICES § 7-101(i). "Probation" is "[a] court-imposed criminal sentence that, subject to stated conditions, releases a convicted person into the community instead of sending the criminal to jail or prison[.]" *Probation*, BLACK'S LAW DICTIONARY (11th ed. 2019). A probationer must routinely check in with a probation officer during the probationary term. Neither this Court

---

[6] Neither party argues that Mr. Peterson was not convicted. A "conviction" has both a "general and popular" meaning and a "legal and technical" meaning. *See Myers v. State*, 303 Md. 639, 642-43, 496 A.2d 312, 313-14 (1985) (holding that conviction in its "general and popular sense" means "the establishment of guilt prior to, and independent of, the judgment of the court[,]" and in its "legal and technical sense[,]" means "the final judgment and sentence rendered by a court pursuant to a verdict or plea of guilty"). No matter which definition we employ, Mr. Peterson, in the instant case, was convicted as envisioned by the UPPA. The circuit court's judgment satisfies the legal definition, and Mr. Peterson's NCR plea prior to the circuit court judgment satisfies the general definition. *See also Treece v. State*, 313 Md. 665, 676, 547 A.2d 1054, 1059-60 (1988) (holding that "the defendant who 'successfully' pleads [NCR] is subject to the stigma of a criminal conviction, although [they] may not be subject to all of the consequences that would otherwise flow therefrom").

12

nor the General Assembly have interpreted either word to mean anything other than the two systems defined. Moreover, this Court has consistently held that the UPPA's application extends only to those incarcerated or on parole or probation. In *McMannis v. State*, which was relied upon by both parties, we held that UPPA's predecessor statute, previously codified at MD. CODE, Art. 27 § 645A, extends only to those incarcerated or on parole or probation, meaning it does not extend beyond the plain language. *See* 311 Md. 534, 536 A.2d 652 (1988). Consistent with our precedent and the ordinary definitions, the plain meaning of "parole" and "probation" are unambiguous.

The UPPA specifically grants relief to those on "parole or probation." Crim. Proc. § 7-101. The General Assembly did not extend the UPPA to the "functional equivalents" of parole and probation, as Mr. Peterson urges us to do. As stated, "the General Assembly is presumed to have meant what it said and said what it meant." *Bellard*, 452 Md. at 481, 157 A.3d at 280. The General Assembly was aware of what terms and relief it adopted under the UPPA. If the General Assembly wanted to include conditional release in the UPPA, it would have done so. Furthermore, the General Assembly excluded the phrasing "functional equivalents" from the UPPA. The plain language of the UPPA reveals the General Assembly's intent—to provide relief for defendants incarcerated or serving a term of parole or probation.

Assuming, *arguendo*, that the General Assembly intended to include the "functional equivalent" of parole or probation, conditional release would still not qualify, because it is not a criminal sanction.

Probation is a punishment. Although [this Court has] called probation 'a matter of grace' and effectively clemency, its fundamental nature is different from the treatment of people found not criminally responsible. Commitment of those found not criminally responsible and the restrictions of conditional release are not designed to punish, but rather to protect the public from the patient and the patient from [themselves]. If the patient is unlikely to represent a risk to others or [themselves], [Crim. Proc.] § 3-114 mandates that the patient be discharged if a court renders affirmatively such a holding. Although the State supervision could be indefinite potentially, it could also be relatively brief. Unlike someone subject to probation, there is no longer a determined time for which the patient will be subject to judicial oversight, absent an outright discharge.

*Harrison-Solomon*, 442 Md. at 286-87, 112 A.3d at 428 (internal citations omitted). Although we have held that conditional release and probation are "similar superficially," they are not functionally equivalent because "of [their] disparate foundational purposes." *Id.* at 285, 112 A.3d at 427. Conditional release restricts freedom and liberty. However, its limitations on liberty differ from the limitations created by parole and probation. Since conditional release is fundamentally different from parole and probation, it cannot be considered the "functional equivalent" of either parole or probation.

Accordingly, Mr. Peterson does not satisfy the UPPA's second requirement of being on parole or probation.

3. The UPPA does not provide relief for defendants found to be NCR who have been civilly confined.

The UPPA also grants relief to people "confined under sentence of imprisonment," but it does not provide relief for those civilly committed. Crim. Proc. § 7-101. Just as with "parole or probation," the General Assembly did not include "functional equivalent" with the phrase "confined under sentence of imprisonment." Defendants civilly committed are not entitled to relief under the UPPA because the General Assembly excluded civil

14

commitment and the phrasing "functional equivalent" from the explicit language of the UPPA.

Even if the General Assembly intended to include the "functional equivalent" of "confined to sentence of imprisonment[,]" defendants who have been civilly committed are not included because civil confinement is fundamentally different from imprisonment. A defendant convicted of a crime and subsequently found NCR is not held accountable for his or her criminal actions because "none of the theories which underlie our criminal law— prevention, restraint, rehabilitation, deterrence, education, and retribution—are furthered by punishing those found to be NCR." *Peterson*, 2019 WL 328416 at *5. Because of this, a NCR defendant is not, and cannot be, subjected to criminal punishment. *Pouncey v. State*, 297 Md. 264, 269-70, 465 A.2d 475, 478 (1983). A defendant found NCR is civilly committed to an inpatient facility, designated by the Department, for an indeterminate amount of time. Civil confinement subjects NCR defendants to different conditions than those defendants confined by prison sentences. However, civil commitment is designed to protect, not punish. *Harrison-Solomon*, 442 Md. at 286-87, 112 A.3d at 428.[7] As such, civil commitment is not a criminal sanction.

---

[7] In *Harrison-Solomon*, the defendant plead guilty to two counts of second-degree assault and the circuit court found him not criminally responsible. Thereafter, the court committed him to the Department for inpatient treatment. *Harrison-Solomon*, 442 Md. at 260, 112 A.3d at 412. After his initial commitment, and several times thereafter, the defendant was conditionally released. Among those conditions, the court ordered him to:

> (1) reside with his mother; (2) receive and follow the treatment advice of a specified psychiatrist; (3) attend a semester of high school and thereafter remain involved with meaningful daytime activities approved by his

(continued . . .)

15

On the other hand, a defendant who is only found guilty, rather than both guilty and NCR, *can* be punished for his or her crimes and imprisoned because imprisoning these defendants fulfills our criminal justice purposes. *Pouncey*, 297 Md. at 269-70, 465 A.2d at 478. Criminal confinement is a criminal sanction, designed to *punish*, not protect. *Harrison-Solomon*, 442 Md. at 286-87, 112 A.3d at 428. A criminal sentence has a pre-determined duration and, as stated, subjects individuals to conditions dissimilar to the conditions NCR defendants face. *See Vitek v. Jones*, 445 U.S. 480, 100 S. Ct. 1254 (1980). By definition, imprisonment is a criminal sanction. Thus, even if the General Assembly intended to include the "functional equivalent" of "confined under sentence of imprisonment" in the UPPA's jurisdiction, civil commitment is fundamentally different from criminal confinement and not its "functional equivalent."

In sum, the UPPA's jurisdiction does not extend to those civilly committed because the plain language omits this language and these defendants. The General Assembly intended to exclude these defendants because "the General Assembly is presumed to have meant what it said and said what it meant." *Bellard*, 452 Md. at 481, 157 A.3d at 280. Moreover, civil and criminal confinement are fundamentally different. Because Mr.

_____

(. . .continued)

> therapist; (4) refrain from using illegal drugs or alcohol and submit to urine testing; and (5) notify and receive approval of his therapist before taking certain actions, such as changing his place of residence, employment, or marital status.

*Id.* at 260-61, 112 A.3d at 412. The court ordered each of these unique conditions to protect the public from the defendant and the defendant from himself rather than to punish the defendant for his criminal acts by issuing a term of imprisonment or parole or probation.

16

Peterson falls outside of the class eligible for relief under the UPPA, he is not entitled to relief under the UPPA. The Court of Special Appeals did not err in coming to this conclusion.

### C. *Coram nobis relief is only available to those who suffer significant collateral consequences.*

A writ of error *coram nobis* is a form of Maryland common law relief that requires a petitioner to satisfy certain qualifying elements. A petitioner is entitled to *coram nobis* relief *only if*:

> (1) the petitioner challenges a conviction based on constitutional, jurisdictional[,] or fundamental grounds, whether factual or legal; (2) the petitioner rebuts the presumption of regularity [that] attaches to the criminal case; (3) the petitioner fac[es] *significant collateral consequences* from the conviction; (4) the issue as to the alleged error has not been waived or finally litigated in a prior proceeding, [absent] intervening changes in the applicable law; and (5) the petitioner is not entitled to another statutory or common law remedy (for example, the petitioner cannot be incarcerated in a State prison or on parole or probation, as the petitioner likely could then petition for post-conviction relief).

*Jones*, 445 Md. at 338, 126 A.2d at 1170 (alterations in original) (internal quotation marks omitted) (emphasis added). In the case at bar, the most determinative element is element 3: whether Mr. Peterson suffered significant collateral consequences as a result of his NCR plea. We hold that Mr. Peterson did not suffer significant collateral consequences. We explain.

Within the context of *coram nobis* relief, "conviction" is used to "identify a person eligible for relief under the petition as one who, *inter alia*, is facing significant collateral consequences because of having been found guilty of a criminal offense. . . . The critical issue is whether the finding of guilt did or will in fact cause significant collateral

17

consequences to the person petitioning for *coram nobis* relief." *Abrams v. State*, 176 Md. App. 600, 616-17, 933 A.2d 887, 897 (2007).[8] In *Skok v. State*, 361 Md. 52, 760 A.2d 647 (2000), we clearly established that the significant collateral consequences must arise from the conviction.

A direct consequence of a conviction is one where the result has "a definite, immediate[,] and largely automatic effect on the range of the defendant's punishment." *Yoswick v. State*, 347 Md. 228, 240, 700 A.2d 251, 256 (1997) (citing *Cuthrell v. Director, Patuxent Inst.*, 475 F.2d 1364, 1366 (4th Cir. 1973)). A collateral consequence is one excluded from the court's judgment and is not a "definite, practical consequence" of the conviction. *Cuthrell*, 475 F.2d at 1366. Civil commitment is a *direct* consequence of a finding of guilty and subsequent finding of NCR. Specifically,

> [a defendant's] confinement in a state mental institution is a direct consequence of adjudications at [their] criminal trial that [they were] guilty of committing a crime but insane at the time of the crime. The commitment is not simply a consequence of the insanity finding, as a person, whether sane or insane, may not be committed for an offense of which he has been acquitted. In such event, the accused . . . walks out of the courtroom a free man. Instead, the commitment to the mental hospital is the 'disposition' portion of the judgment in the criminal case, which is composed of the verdict that [they] committed the criminal act charged and the disposition of [them], as a final judgment.

*Anderson*, 310 Md. at 224-25, 528 A.2d at 908 (internal quotation marks and citations omitted).

---

[8] Although this was a Court of Special Appeals opinion, we adopted this view in *Rivera v. State*, 409 Md. 176, 973 A.2d 218 (2009).

In *Anderson*, the defendant was charged with first degree murder but, after a trial, was found "not guilty by reason of insanity." 310 Md. at 219, 528 A.2d at 905. Because of this finding, the circuit court ordered the defendant be evaluated to determine whether he should be civilly committed rather than criminally sanctioned. *Id.* Based on the evaluation, the circuit court civilly committed the defendant to a mental institution. *Id.* Similar to the defendant in *Anderson*, Mr. Peterson was immediately committed to a mental health facility, based on the circuit court's NCR finding, rather than confined to a term of imprisonment. He was later conditionally released. Thereafter, he was re-confined and conditionally released on several occasions. Just as the defendant in *Anderson*, Mr. Peterson's initial and subsequent civil commitments were direct consequences of his conviction and finding of NCR.

In sum, Mr. Peterson's initial commitment, conditional release, and re-commitments were direct consequences of his conviction and finding of NCR, as contemplated by our decision in *Anderson*. Accordingly, Mr. Peterson is not entitled to *coram nobis* relief, and the Court of Special Appeals did not err in concluding as such.

### D. Under <u>Sabisch</u>, *habeas corpus relief may be available to a defendant found NCR.*

We have not previously decided whether *habeas corpus* relief is available to a defendant found NCR. Although Mr. Peterson did not seek, nor did the Court of Special Appeals address, *habeas corpus* relief, given our holding in *Sabisch v. Moyer*, 466 Md. 327, 220 A.3d 272 (2019), a circuit court could determine that such relief may be available to defendants who are not "physically restrained," but are found NCR.

19

The United States Supreme Court has held confinement, whether civil or criminal, is a significant deprivation of liberty. *See Jones v. Cunningham*, 371 U.S. 236, 83 S. Ct. 373 (1963).[9] In light of the circumstances relative to Mr. Peterson and our opinion in *Sabisch*, those found NCR may be eligible for *habeas corpus* relief.

The Maryland Courts and Judicial Proceedings Article ("Cts. & Jud. Proc.") provides the following:

> A person committed, detained, confined, or restrained from his lawful liberty within the State for an alleged offense or under any color or pretense or any person in his behalf, may petition for the writ of *habeas corpus* to the end that the cause of the commitment, detainer, confinement, or restraint may be inquired into.

MD. CODE ANN., CTS. & JUD. PROC. § 3-702(a).

The Maryland Constitution authorizes *habeas corpus* relief and reflects that "[t]he General Assembly shall pass no Law suspending the privilege of the Writ of *Habeas Corpus*." MD. CONST. Art. III, § 55. We need not go through the entire interpretation of Maryland's *habeas corpus* relief as we did in *Sabisch*. Ultimately, in *Sabisch*, we overturned prior cases requiring "physical restraint" and held that a petitioner only needs to be "committed, detained, confined, or restrained from lawful liberty within the State" to be eligible. *Sabisch*, 466 Md. at 331, 220 A.3d at 274 (*citing* Cts. & Jud. Proc. § 3-702(a)).

---

[9] *See also Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S. Ct. 2486, 2496 (1975) ("There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law.").

We defined "commit," "detain," "confine," and "restrain" in *Sabisch*. We held "commit," "detain," and "confine," imply physical force or physical constraint. *Sabisch*, 466 Md. at 367, 220 A.3d at 295.[10] "Restrain," on the other hand, is not limited to physical restraint but includes broader restrictions on a person's liberty.

As stated *supra*, civil commitment is designed to protect the public rather than punish the offender. However, this does not alter the fact that civil commitment falls squarely within the plain language of our *habeas corpus* statute. "Commitment" is defined as "[t]he act of confining a person in a prison, mental hospital, or other institution; esp[ecially] the sending of a person to jail, by warrant or order, for crime, contempt or contumacy[.]" *Commitment*, BLACK'S LAW DICTIONARY (11th ed. 2019). A defendant found NCR is immediately "committed to [a] facility that the Health Department designates for institutional inpatient care or treatment." Crim. Proc. § 3-112(b). In other words, the defendant is civilly committed.[11] Civil commitment is a significant deprivation of liberty and deserves constitutional protection. *See Addington*, 441 U.S. at 425, 99 S. Ct. at 1809. Therefore, civil commitment deserves consideration of constitutional and statutory remedies when warranted by the circumstances presented.

---

[10] Although we held that "physical restraint" was no longer required under our *habeas* statute, we nonetheless determined that, under the facts of the case, Mr. Sabisch did not suffer significant restraint in Maryland and was therefore not eligible for *habeas corpus* relief. *Sabisch*, 466 Md. at 378, 220 A.3d at 302.

[11] Black's Law Dictionary defines "civil commitment" as "[a] court-ordered commitment of a person who is ill, incompetent, drug addicted, or the like[.]" *Civil Commitment*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Defendants on conditional release may be eligible for *habeas corpus* relief. Conditional release is a "therapeutic release of a mentally ill individual from a psychiatric hospital as part of a continuing course of treatment." *Bergstein v. State*, 322 Md. 506, 516, 588 A.2d 779, 784 (1991) (footnote omitted).  A court can grant conditional release to a defendant found NCR if it finds the defendant is not a danger to other people, themselves, or property.  Crim. Proc. § 3-114(c).  As expressed *supra*, we have held that a court must consider the defendant's "dangerousness" within the context of the conditions imposed on the defendant.  *Hawkes*, 433 Md. at 133, 70 A.3d at 325.  Therefore, inherent in a conditional release order are conditions that the defendant must adhere to; in other words, conditional release may deprive a defendant of a certain level of liberty.  These conditions may deprive the defendant of engaging in conduct he or she otherwise would engage in and may require the defendant to engage in conduct he or she otherwise would *not* engage in.  If a defendant violates the terms of conditional release, the court can revoke the conditional release and re-commit the defendant. [12]  Accordingly, the conditional release order may deprive the defendant of significant liberty interests.

---

[12] Furthermore, a violation of conditional release can lead to re-commitment (in other words, civil commitment), which as stated, falls squarely into the plain language deserving of *habeas corpus* relief.  If a defendant violates the conditions of conditional release, the State's Attorney determines if there is a factual basis for the complaint that the defendant has violated their conditional release.  Crim. Proc. § 3-121(a).  The State's Attorney then must notify the Department and file a petition with the court.  The court decides if there is probable cause to believe that the defendant has violated their conditional release.  Crim. Proc. § 3-121(d) & (e).  If the court finds probable cause, the court issues a hospital warrant and the defendant will be transferred to a facility designated by the Department.  Crim. Proc. § 3-121(e).

22

As the United States Supreme Court has held, confinement of any kind, whether civil or criminal, is a significant deprivation of liberty. Specifically, within the context of civil confinement, the United States Supreme Court, in *Addington*, 441 U.S. at 425, 99 S. Ct. at 1809, "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." "[I]nvoluntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor*, 422 U.S. at 580, 95 S. Ct. at 2496.

In *Sabisch*, we held that determining whether a condition of probation is a significant deprivation of liberty requires a case-by-case analysis, and we choose to apply a similar case-by-case analysis to conditions placed on defendants during his or her conditional release. 466 Md. at 327, 220 A.3d at 272. Mr. Peterson was required to adhere to several restrictions to maintain his conditional release. Mr. Peterson was required to attend mandatory mental health treatment and substance abuse treatment appointments. He was ordered to live on hospital grounds or in housing approved by the Department. He was also expected to comply with any recommendations from his mental health provider regarding: (1) the type and frequency of his treatments; (2) his participation in other programs, including, but not limited to, family therapy, day programs, and job counseling; (3) psychiatric medication and testing; (4) applying for inpatient treatment; (5) his employment; and (6) traveling outside of Maryland.

Given our holding in *Sabisch* that physical custody may no longer be required when considering a petition seeking *habeas corpus* relief, a circuit court could determine whether

23

Mr. Peterson is entitled to *habeas corpus* relief, upon receipt of an appropriate filing. Indeed, the State conceded at oral argument that if physical restraint were not a requirement under the *habeas corpus* statute, Mr. Peterson may be entitled to such relief.

**CONCLUSION**

In sum, we hold that Mr. Peterson, who was found guilty but not criminally responsible, was not eligible for relief under the plain language of the Uniform Post-Conviction Procedure Act. We also hold that Mr. Peterson was not entitled to relief through a writ of error *coram nobis* because he did not suffer significant collateral consequences. Rather, Mr. Peterson's initial commitment, conditional release, and re-commitments were direct consequences of his conviction and finding of NCR. However, in light of the Court's decision in *Sabisch*, the circuit court may determine whether Mr. Peterson is entitled to *habeas corpus* relief, upon receipt of an appropriately filed petition. We affirm the judgment the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**